**IN THE UNITED STATES COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MADELEINE SMITH, | ) |
| | ) |
| RUTA AIDIS, | ) |
| | ) |
| SYLVIA ALFORD, | ) Civil Action No. 1:26-cv-183 |
| | ) |
| DANIEL BAILEY, | ) DATE: January 21, 2026 |
| | ) |
| ARUNTHI BARTLETT, | ) |
| | ) |
| MALIA BOGGS, | ) |
| | ) |
| IOANA BOUVIER, | ) |
| | ) |
| CONSTANCE CAMPBELL, | ) |
| | ) |
| STACY CREVELLO, | ) |
| | ) |
| MELISSA DESAI, | ) |
| | ) |
| LARA EVANS, | ) |
| | ) |
| KAREN FOWLE, | ) |
| | ) |
| EVA GONYEA, | ) |
| | ) |
| SHANNON GRISWOLD, | ) |
| | ) |
| ASHLEY HEIBER, | ) |
| | ) |
| MARK  HUISENGA, | ) |
| | ) |
| DILSHIKA JAYAMAHA, | ) |
| | ) |
| LALA KASIMOVA, | ) |
| | ) |
| MEGHAN LEFEBER, | ) |
| | ) |
| ALI MACALADY, | ) |
| | ) |

ERIC MANTON,                     )

LESLEY PERLMAN,           )

WALEED RABIEH,            )

LIANNA SARKISIAN,         )

KIRSTIN SIEX,               )

REBECCA TURNER,          )

KATIE WEST,                )

OLAF ZERBOCK, and         )

DANIELLE ADVANI,[1]      )

    Plaintiffs,              )

v.                         )

UNITED STATES AGENCY FOR INTERNATIONAL )
DEVELOPMENT,           )
    1300 Pennsylvania Avenue, NW,    )
    Washington, DC 2004,       )

UNITED STATES DEPARTMENT OF STATE,    )
    2201 C Street, NW         )
    Washington, DC 20520,      )

MARCO RUBIO, U.S. Secretary of State,    )
    2201 C Street, NW         )
    Washington, DC 20520,      )

UNITED STATES OFFICE OF MANAGEMENT AND )
BUDGET,               )
    725 17th Street, NW       )
    Washington, DC 20503,      )

---

[1] *See* sealed notice concurrently filed herewith for additional information regarding Plaintiffs, as required by Local Civil Rule 5.1(c)(1).

RUSSELL VOUGHT, Director, U.S. Office of Managem
and Budget and USAID Administrator,
    725 17th Street, NW,
    Washington, DC 20503

UNITED STATES OFFICE OF PERSONNEL
MANAGEMENT,
    1900 E Street, NW
    Washington, DC 20415,

SCOTT KUPOR, Director, U.S. Office of Personnel
Management,
    1900 E Street, NW
    Washington, DC 20415,

UNITED STATES DEPARTMENT OF
GOVERNMENT EFFICIENCY,
    736 Jackson Place, NW
    Washington, DC 20503, and

AMY GLEASON, Acting Administrator, DOGE Services
    736 Jackson Place, NW
    Washington, DC 20503,

    Defendants.

## **NATURE OF THE COMPLAINT**

The United States Agency for International Development ("USAID" or the "Agency") terminated Plaintiffs, twenty-nine employees appointed to foreign service employment, in violation of their First Amendment rights against removal based on perceived political affiliation, through a process blatantly violating the Agency's regulations and therefore, Plaintiffs' Fifth Amendment Due Process Clause rights.  USAID's policies regarding time-limited employment impose on Plaintiffs—employees the government *appointed* to federal service—burdens associated with federal appointment but deny them fundamental benefits of appointment to federal service—namely, protections against pretextual and partisan terminations, and rights of administrative or judicial review.

3

USAID maintained this structure for its foreign service limited workforce for one reason: it allows the Agency to have its cake and eat it, too.  The Agency achieves this unequal bargain by designating Plaintiffs as appointed officials but maintaining that they can be terminated at will— as if they are contractors or probationary employees.  But a federal service appointment is not a contract that the government may terminate for convenience.  Instead it is well-settled since *Marbury v. Madison* that the act of appointment, as opposed to signing a contract or beginning a probationary period, confers rights protected by the Constitution. 5 U.S. 137, 162 (1803) (finding Marbury's "appointment is not revocable, and cannot be annulled.  It has conferred legal rights, which cannot be resumed"). And when the government violates appointed employees' constitutional and statutory rights, Plaintiffs may seek judicial redress, and courts may order money damages, restoration to office, placement in appropriate duty or retirement status, and the correction of records.

In this case, officials from USAID, the Executive Office of the President, the Office of Personnel Management ("OPM"), the Office of Management and Budget ("OMB") and the "Department of Government Efficiency" ("DOGE") unlawfully terminated Plaintiffs because of their perceived association with the Democratic Party and with no prior notice of proposed termination or post-termination right to review.  Senior Trump Administration officials, including several individual Defendants, publicly derided the Agency as "anti-American," as a "criminal organization" full of "radical left Marxist[s]" implementing "liberal word soup" programs that amounted to "cultural imperialism."  OMB Director Russell Vought stated that he wanted federal employees such as Plaintiffs "to be traumatically affected … when they wake up in the morning," adding: "We want them to not want to go to work because they are increasingly viewed as the

villains."  DOGE's Elon Musk stated that it was time for USAID "to die" and that he fed the Agency "into the woodchipper."

Public employees maintain First Amendment free speech and association rights not to be fired due to their perceived partisan affiliations.  Defendants, therefore, put up a façade of a reduction-in-force (RIF) to terminate Plaintiffs—all of whom possess twenty to thirty years of experience—as a political punishment forbidden by the First Amendment.  To achieve this unlawful end, Defendants used unlawful means:  violating the Administrative Leave Act ("ALA") by forcing Plaintiffs on leave for more than ten days and violating both their Fifth Amendment due process rights and the Administrative Procedure Act, which require agencies to simply follow their own procedures.  Plaintiffs' rights, gained from appointment to federal service, were read out of existence without recourse.

The establishment of a nonpartisan civil service was a reaction to the corrupt "spoils" system of the late nineteenth century Gilded Age, in which political machine bosses dispensed patronage jobs.  This practice reached its nadir with the assassination of President James Garfield by a frustrated foreign service office seeker in 1881.

Reforming the public service system to protect against such abuses throughout American history is not a matter of ideological politics but a core nonpartisan, good-government value.  In advancing such reforms Democratic President Jimmy Carter noted that one of the main "complaints most often heard against the present system are that Federal employees have too little protection against political abuse," and emphasized that "the system that perpetuates [that] needs to be changed."  J. Carter, *Federal Civil Service Reform Remarks Announcing the Administration's Proposals to the Congress* (Mar. 2, 1978), https://www.presidency.ucsb.edu/documents/federal-civil-service-reform-remarks-announcing-the-administrations-proposals-the-congress.

In advocating for safeguards against political pressure for federal employees, President Carter echoed Republican President Theodore Roosevelt: "The minute that we make men's bread and butter depend upon their political action, that action ceases to be influenced by considerations of the public weal, and is taken from considerations of private benefit." T. Roosevelt, ATLANTIC MONTHLY, *The Present Status of Civil Service Reform* (Feb. 1895), https://www.theatlantic.com/magazine/archive/1895/02/the-present-status-of-civil-service-reform/519723/. The unlawful treatment and termination of Plaintiffs contravene the legal and structural guarantees that have been put in place to avoid that harm, and the Court should declare these actions to be unlawful.

## **BACKGROUND**

1.    The Federal Government is required to obtain its employees by direct hire and after appointing them to the civil or foreign service.

2.    Formal appointment to federal service subjects officers to both the benefits and the burdens prescribed under the applicable civil service or foreign service laws and regulations that apply specifically to appointed officers.

3.    The Federal Government can only use alternative hiring mechanisms to the extent that Congress has specifically authorized them.

4.    USAID is an independent agency, led by an administrator serving under the guidance of the Secretary of State. *See* 22 U.S.C. §§ 2384, 6592.

5.    Since 1961, USAID employees have carried out statutory and program-specific congressional mandates under eleven presidential administrations of both political parties.

6.    USAID programs supported United States interests by providing assistance to countries suffering from disease, famine, natural disasters, poverty, or other humanitarian needs.

7.     USAID employees are admired for their nonpartisan dedication to advancing the

Nation's fundamental and long-term interests, as opposed to the popular whims of the day, as

reflected in President John Kennedy's remarks:

> "I WANT to tell you what I am sure you must be aware of, or you would not be
> here, and that is the importance of this program and the importance of your work
> and how much we depend upon your judgment.  Aid, the concept of foreign
> assistance, is not a popular program in the United States.  That's a well-known fact.
> And, therefore, there will not be farewell parades to you as you leave, or parades
> for you when you come back.  But I cannot think of any action which is more
> important to the effort in which we are engaged than what you are doing...." J.
> Kennedy, *Remarks to a Group of Overseas Mission Directors of the Agency for
> International Development* (Jun. 8, 1962), https://www.presidency.ucsb.edu/docu
> ments/remarks-group-overseas-mission-directors-the-agency-for-international-
> development.

8.     To carry out its important mission, the Agency enjoyed the services of foreign

service limited or "FSL" employees, a special class of employees highly valued for their extensive

experience, hired into critical senior technical roles addressing urgent, unforeseen needs. *See* 22

U.S.C. § 3949.

9.     In March 2025, USAID terminated its FSL employees *en masse*, with neither pre-

termination notice nor individualized assessments of their performance and experience.

10.     Defendants mislabeled Plaintiffs' work as criminally wasteful and performed only

in the service of the Democratic Party and then terminated them to punish them and harm their

reputations.  Plaintiffs seek to remedy that harm through a declaratory judgment that they hold

the same benefits as similarly-appointed career Foreign Service officers who can appeal their

terminations, and by seeking restoration to their positions, damages, back pay, interest, attorneys'

fees and costs.

**JURISDICTION**

11.     This Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331, *Federal question*; 28 U.S.C. §§ 2201-02, the Declaratory Judgment Act; 5 U.S.C. § 551 *et seq*., the Administrative Procedure Act; and 28 U.S.C. § 1361, *Action to compel an officer of the United States to perform his duty*.

12.     Permissive joinder of Plaintiffs is appropriate pursuant to Fed. R. Civ. P. 20(a)(1) as Plaintiffs jointly assert rights to relief, with respect to the same series of occurrences, because questions of law and fact arising in this action are common to all Plaintiffs.

**VENUE**

13.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c), *Venue generally*.

**THE PARTIES**

14.     Plaintiffs were USAID employees.

15.     Defendant USAID employed Plaintiffs as FSL employees after appointing them to service.

16.     Plaintiff Danielle Advani accepted a USAID FSL offer of appointment on November 6, 2023, to serve as a Program Officer (Communication, Knowledge Management, and Learning Advisor) in the Bureau for Resilience, Environment, and Food Security, Center for Nutrition.

17.     Plaintiff Ruta Aidis accepted a USAID FSL offer of appointment on April 11, 2022, to serve as a Senior Advisor for Economic Growth and Trade in the Gender Equality and Women's Empowerment Hub.

18.     Plaintiff Sylvia Alford accepted a USAID FSL offer of appointment on November 7, 2022, to serve as a Health Development Officer in the Bureau for Africa, Office of Sustainable Development, Health Team.

19.     Plaintiff Daniel Bailey accepted a USAID FSL offer of appointment on August 2, 2021, to serve as Agricultural Development Officer in the Bureau for Resilience and Food Security.

20.     Plaintiff Arunthi Premila Bartlett accepted a USAID FSL offer of appointment on December 7, 2020, to serve as a Health Development Officer in the Bureau of Global Health, Office of Population and Reproductive Health, Service Delivery Improvement Division.

21.     Plaintiff Malia Boggs accepted a USAID FSL offer of appointment on June 20, 2011, to serve as a Health Development Officer in the Bureau for Global Health, Office of Maternal, Child Health and Nutrition and served until June 16, 2020.  Ms. Boggs accepted a second FSL appointment with USAID on November 4, 2024, as a Senior Health Advisor in the Bureau for Global Health, Office of Health Systems.

22.     Plaintiff Ioana Bouvier accepted a USAID FSL offer of appointment on April 26, 2020, to serve as a Natural Resources Officer/Senior Spatial Data Science and Technology Advisor in the Bureau of Environment, Energy and Infrastructure, in the Center for Natural Environment.

23.     Plaintiff Connie Campbell accepted a USAID FSL offer of appointment on December 16, 2024, to serve as Natural Resource Officer in the Bureau for Asia.

24.     Plaintiff Stacy Crevello accepted a USAID FSL offer of appointment on November 9, 2020, to serve as Deputy Bureau Environment Officer in the Europe and Eurasia Bureau.  Ms. Crevello accepted a second FSL appointment with USAID on November 10, 2022, to serve as a Natural Resource Officer in the Africa Bureau.

25.     Plaintiff Melissa Desai accepted a USAID FSL offer of appointment on January 13, 2025, to serve as a Program Officer (Management and Program Analyst), in the Bureau for Democracy, Human Rights, and Governance, Anti-Corruption Center.

26.    Plaintiff Lara Evans accepted a USAID FSL offer of appointment on September 30, 2019, to serve as a General Development Officer, Social Protection Advisor in the Bureau for Resilience and Food Security.

27.    Plaintiff Karen Fowle accepted a USAID FSL offer of appointment on January 18, 2022, to serve as a Program Officer in the Technology Division of the Bureau for Inclusive Growth, Partnerships, and Innovation.

28.    Plaintiff Ewa Gonyea accepted a USAID FSL offer of appointment on February 13, 2023, to serve as a Program Officer (Intelligence Research Analyst), for the Pakistan Mission in the Bureau for Asia.

29.    Plaintiff Ashley Heiber accepted a USAID FSL offer of appointment on November 7, 2022, to serve as Program Officer in the Bureau for Inclusive Growth, Partnerships, and Innovation, in the Innovation, Technology and Research Hub.

30.    Plaintiff Mark Huisenga accepted a USAID FSL offer of appointment on July 5, 2020, to serve as a General Development Officer as the Commercialization and Scaling Team Lead in the Bureau for Resilience and Food Security, Center for Agriculture, Market Systems and Finance Division.  On June 30, 2025, USAID issued Mr. Huisenga a Resignation in Lieu of Involuntary Action.

31.    Plaintiff Dilshika Jayamaha accepted a USAID FSL offer of appointment on July 6, 2020, to serve as a Program Officer in the Bureau for Middle East and North Africa, Deputy Program Director for USAID/Iraq Mission. Without a break in service, Ms. Jayamaha accepted a second FSL offer of appointment as a Democracy Officer with the Bureau for Asia on January 16, 2023.

32.    Plaintiff Lala Kasimova accepted a USAID FSL offer of appointment on December 2, 2024, to serve as a Program Officer (Senior Monitoring, Evaluation and Learning Advisor) in the Bureau for Asia, Office of Strategic Planning and Operations.

33.    Plaintiff Meghan Lefeber accepted a USAID FSL offer of appointment on July 6, 2020, to serve as a Program Officer in the Bureau for Asia. Without any break in service, Ms. Lefeber accepted a second FSL offer of appointment as a Private Enterprise Officer in the Bureau for Africa on January 27, 2025.

34.    Plaintiff Alison Macalady accepted a USAID FSL offer of appointment on November 12, 2019, to serve as a Natural Resources Officer and Senior Water Security Advisor within the Bureau for Resilience and Food Security. On August 12, 2022, without a break in service, Dr. Macalady accepted a second FSL position as an Environment Officer within USAID/Peru and South America Regional Mission.

35.    Plaintiff Eric Manton accepted a USAID FSL offer of appointment on September 25, 2023, to serve as Program Officer in the Bureau of Europe and Eurasia.

36.    Plaintiff Waleed Rabieh accepted a USAID FSL offer of appointment on January 27, 2025, to serve as Private Enterprise Officer, in the Bureau for Inclusive Growth, Partnerships, and Innovation.

37.    Plaintiff Lianna Sarkisian accepted a USAID FSL offer of appointment on December 6, 2021, to serve as Health Development Officer, Senior Global Health Policy Advisor in the Bureau for Global Health, Office of Policy, Programs, and Planning.

38.    Plaintiff Kirstin Siex accepted a USAID FSL offer of appointment on September 27, 2020, to serve as the Senior Biodiversity Advisor, Natural Resource Officer in the Bureau for Africa.

39.    Plaintiff Madeleine Smith accepted a USAID FSL offer of appointment on January 21, 2021, to serve as a Regional Development Officer, Senior Resilience Integration Advisor, in the Bureau for Resilience, and Food Security, Resilient Communities and Systems Division, Center for Resilience. In January 2024 after receiving annual cash and recognition individual management and superior honor awards for exceptional performance, her title was elevated to Senior Resilience Integration Advisor.

40.    Plaintiff Rebecca Turner accepted a USAID FSL offer of appointment on August 30, 2021, to serve as a Health Development Officer in the Bureau for Global Health, Office of Population and Reproductive Health, Commodity, Security, and Logistics Division.

41.    Plaintiff Katie West accepted a USAID FSL offer of appointment on July 19, 2020, to serve as a General Development Officer in the Bureau for Resilience and Food Security.  Ms. West accepted a second FSL appointment with USAID on April 23, 2023, to serve as Program Officer in RFS.

42.    Plaintiff Olaf Zerbock accepted a USAID FSL offer of appointment on September 15, 2019, to serve as a Natural Resources Officer with the Bureau for Economic Growth, Education and Environment.  Without a break in service, Mr. Zerbock accepted a second FSL offer of appointment with USAID on February 28, 2022, as an Environmental Protection Officer in the Bureau for Development, Democracy and Innovation.

43.    USAID terminated Plaintiffs Smith, Turner, Desai, Bartlett, Bouvier, Heiber, Huisenga, Alford, Sarkisian, Boggs, Crevello, Aidis, Fowle, Evans, Bailey, Gonyea, West, Lefeber, Jayamaha, Advani, Rabieh, Zerbock, Kasimova, Siex, Manton, Campbell and Macalady on July 1, 2025.

44.    Plaintiff Shannon Griswold accepted a USAID FSL offer of appointment on October 1, 2018, to serve as a Senior Learning Advisor in the US Global Development Lab.

45.    Plaintiff Lesley Perlman accepted  a USAID FSL offer of appointment on October 11, 2020, to serve as a General Development Officer, Senior Agriculture Analyst and Learning Advisor in the Bureau for Resilience and Food Security.

46.    The Agency terminated Plaintiffs Griswold and Perlman on September 2, 2025.

47.    Named defendants include federal departments and agencies, and the heads of those departments and agencies, implementing executive orders regarding reductions in force across the government.

48.    At all material times, USAID employed the Plaintiffs at its principal place of business in Washington, D.C.  All other agencies and departments named as defendants are headquartered in Washington, D.C.

49.    Defendant DOGE is a component of the Executive Office of the President established by Executive Order 14158, *Establishing and Implementing the President's "Department of Government Efficiency"* (Jan. 20, 2025) (quotation marks in original).

50.    Defendant Amy Gleason is Acting Administrator of DOGE.  Plaintiffs sue Administrator Gleason in her official capacity.

51.    Defendant Scott Kupor is Director of OPM.  Plaintiffs sue Director Kupor in his official capacity.

52.    Defendant Marco Rubio is Secretary of State.  Defendant Rubio served as the Acting Administrator of USAID from February 3 to August 29, 2025.  Plaintiffs sue Secretary Rubio in his official capacity.

53.     Defendant Russell Vought is Director of OMB.  Director Vought currently serves as USAID's Acting Administrator.  Plaintiffs sue Director Vought in his official capacity.

## ALLEGATIONS COMMON TO ALL CLAIMS

### A.     *Plaintiffs' Employment*

54.     Defendant departments, agencies and officers are responsible under the Constitution, statutes and regulations for establishing and administering personnel policies, and applying them to Plaintiffs.

55.      Federal terms of employment may be defined by appointment, or contractual rights, but not both.

56.     Defendants relied on Section 309 of the Foreign Service Act ("FSA") and other grants of authority to appoint Plaintiffs to federal service. *See* Pub. L. 96–465, title I, § 309, Oct. 17, 1980, 94 Stat. 2086, codified at 22 U.S.C § 3949.

57.     Section 612 of the FSA requires that Plaintiffs be treated the same as career Foreign Service Officers ("FSOs") if USAID terminates them for misconduct, including being provided the right to respond, and to an individualized decision upon review. *See* 22 U.S.C. § 4010(a)(2)(A).

58.     While USAID terminated Plaintiffs at-will, as if they are contractors, the Agency earlier treated Plaintiffs as employees, on par with career FSOs, not contractors, because unlike contractors, Plaintiffs received the same training and had the same certification requirements as career FSOs, and performed inherently governmental functions, including supervising other staff, functioning as Contracts Officer's Representatives and Agreement Officer's Representatives, and exercising other fiduciary responsibilities.  For example:

   a. USAID issued Plaintiffs Form W-2 wage and tax statements like career FSOs, not the Internal Revenue Service Form 1099s issued to contractors.

   b. USAID treated Plaintiffs as career direct hires for retirement purposes.

c.  USAID treated Plaintiffs as employees like career FSOs under the Internal Revenue Code, including regarding the foreign earned income tax exclusion and the income tax exclusion of allowances of government employees. *See* 26 U.S.C. §§ 911-12.

d.  USAID treated Plaintiffs as employees who acted directly in the interest of the United States, like career FSOs, for the purposes of the Family and Medical Leave Act. *See* 29 U.S.C. § 2601 *et seq*.

e.  USAID issued Plaintiffs black diplomatic passports like career FSOs and not blue passports like contractors.

f.  USAID provided Plaintiffs annual and sick leave like career FSOs and not contractors.

g.  USAID treated Plaintiffs as employees for the purposes of the Workers' Compensation Act, like career FSOs and not contractors. *See* 5 U.S.C. § 8101 *et seq*.

h.  USAID granted Plaintiffs Foreign Service scale step increases as part of their performance reviews, like career FSOs and not contractors.

i.  USAID granted Plaintiffs locality pay and the same percentage comparability adjustments as career FSOs.

j.  USAID granted Plaintiffs allowances for living quarters, supplemental post, separate maintenance education, and educational travel allowances like career FSOs and not contractors.

k.  USAID required Plaintiffs to submit OPM Form 306s, *Declaration for Federal Employment*, like career FSOs and not contractors. U.S. Office of Personnel Management Optional Forms Page, https://www.opm.gov/media/dxrbwvmb/declaration-for-federal-employment-optional-form-august-2023.pdf (last visited Nov. 10, 2025).

l.  USAID subjected Plaintiffs to Ethics in Government Act requirements such as the lifetime ban on communications involving matters they worked on or in which they possess an interest, and a two-year ban on matters pending under Plaintiffs' official responsibilities, as well as OPM regulations implementing the Act, like career FSOs and not contractors. *See* 18 U.S.C. § 207(a)(1)-(2) and 5 C.F.R. part 737.

m.  USAID subjected Plaintiffs to the same payment and gift restrictions as career FSOs. *See e.g.* 3 FAM 4120.

n.  USAID subjected Plaintiffs to restrictions on political activities under the Hatch Act, like career FSOs and not contractors. *See* 5 U.S.C. § 1501 *et seq*.

59.     The Agency imposed these burdens of appointment to service on Plaintiffs but now denies them concomitant benefits, including protection against termination at will and with no opportunity to appeal, instead choosing to treat them as contractors only for the purpose of their termination.

60.     Plaintiffs are also entitled to Administrative Leave Act protections, which state that "during any calendar year, an agency may place an employee in administrative leave for a period of not more than a total of 10 work days." 5 U.S.C. § 6329a; *see also* 5 C.F.R. 630.1404, *Calendar year limitation*.

**B.    Plaintiffs' Terminations**

61.     After January 20, 2025, Trump Administration officials publicly attacked Plaintiffs' assumed partisan affiliations and falsely labeled their work as criminal, immoral and done only to support the Democratic Party.

62.     As employees appointed to federal service, Plaintiffs are protected against employment decisions violating their First and Fifth Amendment free speech and due process rights and may seek judicial redress.

63.     President Trump stated that USAID was "run by a bunch of radical lunatics, and we're getting them out." *President Trump Speaks to Reporters Upon Return from Mar-a-Lago*, C-SPAN (Feb. 2, 2025), https://www.c-span.org/program/public-affairs-event/president-trump-speaks-to-reporters-upon-return-from-mar-a-lago/655273.

64.     President Trump issued Executive Order 14210, *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative* (Feb. 11, 2025).

65.     The order instructed DOGE, OPM, OMB, and agency heads to "promptly undertake preparations to initiate large-scale reductions in force (RIFs)." *Id*.

66.     Elon Musk, then leading DOGE, attempted to justify shutting down USAID, as its personnel are allegedly "incredibly politically partisan" and their work purportedly supported "radically left causes throughout the world including things that are anti-American." J. Hansler, *Elon Musk said Donald Trump agreed USAID needs to be 'shut down'*, CNN (Feb. 3, 2025), https://www.cnn.com/2025/02/02/politics/usaid-officials-leave-musk-doge.

67.     Mr. Musk stated that "USAID is a criminal organization" and that it was time "for it to die." (@elonmusk), X (Feb. 2, 2025, 12:20 PM), https://x.com/elonmusk/status/1886102414 194835755?lang=en.

68.     He further stated that he would work to feed the Agency "into the woodchipper." Elon Musk (@elonmusk), X (Feb. 3, 2025, 1:54 AM), https://x.com/elonmusk/sta tus/1886307316804263979?s=46.

69.     DOGE participated in USAID's decision to terminate Plaintiffs.

70.     White House deputy chief of staff Stephen Miller also stated that USAID cuts sought to address the assumed ideological make-up of the Agency.

71.     Mr. Miller stated: "Overwhelmingly, the career federal service in this country is far left, left-wing." Mr. Miller continued the attack on Agency personnel, labeling them as "radical left Marxist" supporters of gender theory and "diversity, equity, inclusion …". *Jake Tapper left stunned as Stephen Miller explains why Trump ordered a surprise freeze on federal spending*, DAILY MAIL (Jan. 29, 2025), https://www.dailymail.co.uk/media/article-14336461/Jake-Tapper-Stephen-Miller-trump-freeze-fed-spending.html.

72.     Mr. Miller added: "We looked at USAID as an example, ninety-eight percent either donated to Kamala Harris or another left-wing candidate." *USAID has been 'exposed' as the*

*funding mechanism for the radical left, says Stephen Miller*, Fox News (Feb. 5, 2025), https://www.foxnews.com/video/6368342845112.

73.     Peter Marocco, USAID's Deputy Administrator, also sought to justify the elimination of Plaintiffs' positions in political terms.  Mr. Marocco earlier described Agency employees' responsibilities as working on "Democrat" or "liberal word soup" programs. *Pete Marocco tried to upend USAID in 2020 — and failed. In 2025, he dismantled it*, NPR (Mar. 25, 2025), https://www.npr.org/sections/goats-and-soda/2025/03/25/g-s1-50582/usaid-pete-marocco-trump-foreign-aid.

74.     Mr. Marocco terminated Plaintiffs based on their perceived partisan affiliation and his misperception that USAID's work somehow constituted a federal crime.

75.     During his previous stint at USAID, Mr. Marocco served as the Bureau of Conflict Prevention and Stabilization Assistant to the Administrator.

76.     In 2020, a complaint by Agency staffers detailed that Mr. Marocco questioned "renewing the contracts of individual [personal service contractors] working on programs whose goals he does not support, even though the individuals have highly favorable performance reviews and the programs are widely supported within the interagency." *See Dissent Channel Memo on OTI's Degrading Capacity, Reduced Strategic Impact, and Wasted Resources* (Sept. 17, 2020).

77.     At USAID in 2025, Mr. Marocco routinely berated Agency staff and expressed that he hated working with them.

78.     Mr. Marocco indicated to Congress that he considered criminal referral to the Department of Justice for employees involved with the Agency programs being cut, which include Plaintiffs. *Trump administration considering criminal referrals in USAID fight*,

The Hill (Mar. 5, 2025), https://thehill.com/policy/international/5178414-trump-administration-usaid-criminal-referrals/.

79.    Mr. Marocco oversaw Plaintiffs' forced placement on administrative leave and termination because he believed they supported the Democratic Party, that their work amounted to criminal activity, and, therefore, Plaintiffs should be punished for perceived misconduct.

80.    Timothy Meisburger served as a bureau head in USAID in 2025.

81.    In 2023, Mr. Meisburger published an article titled "Political Discrimination Threatens U.S. Foreign Assistance." T. Meisburger, Political Discrimination Threatens U.S. Foreign Assistance, Heritage Found. (Aug 15, 2023), *https://www.heritage.org/global-politics/report/political-discrimination-threatens-us-foreign-assistance*.

82.    Mr. Meisburger researched Agency employees' partisan affiliations and traced the need for reforming the Agency to its employees' assumed partisan ideology.

83.    He claimed that "well over 90 percent (and sometimes one-hundred percent) of [USAID] employee contributions went only to Democratic candidates and causes," and advocated eliminating "USAID's political bias." *Id*.

84.    In line with Mr. Meisburger's public statements that the Agency needed to be downsized due to what he viewed as its left-leaning ideology, USAID terminated Plaintiffs.

85.    USAID's termination of Plaintiffs was pretextual, punishment for carrying out the Agency's statutorily-mandated work and their perceived ideological affiliation, loosely disguised as a RIF.

86.    While USAID ordinarily conducts employee and program termination through a formal review process, the first round of immediate terminations, which included Plaintiffs and

their positions, was not preceded by any review because the underlying work was perceived as being out of partisan alignment with the Trump Administration, and somehow therefore illegal.

## C.    Post-termination Events

87.    On March 28, 2025, the Department of State announced that USAID's foreign assistance programs would be curtailed and moved to State. Dep't of State, *On Delivering an America First Foreign Assistance Program* (Mar. 28, 2025), https://www.state.gov/on-delivering-an-america-first-foreign-assistance-program/.

88.    That day, Agency employees received a notice from Deputy Administrator Jeremy Lewin, "USAID's Transition to the State Department," stating that the Department "will seek to retire USAID's independent operation," and that the Department will assume responsibility for any Agency program not terminated in full. *See* Dep't of State, USAID's Final Mission (Mar. 28, 2025), https://www.politico.com/f/?id=00000195-de57-dc25-a3b7-deffc6eb0000.

89.    This notice of an upcoming "RIF" did not reassign Agency employees and instead informed them that the State Department would conduct its own "independent hiring process," only "available for eligible USAID employees." *Id.*

90.    The State Department offered well more than three-hundred Agency employees positions with State, but neither State Department nor USAID disclosed the transfer and hiring process for these transitioning employees, to establish compliance with required competitive hiring processes.

91.    After terminating Plaintiffs under the guise that their work is no longer needed, the State Department now seeks to rehire personnel, with far less experience, to carry out the same work at State, establishing that Plaintiffs' skills and experience are still needed.

92.     Even though Plaintiffs possess decades of extensive experience and qualifications in carrying out USAID's mission in a non-political manner, the Agency terminated them as punishment for perceived partisan beliefs, as opposed to reassigning them to continue working pursuant to the current administration priorities.

93.     Defendants continue to engage in this illegal action by seeking to rehire for Plaintiffs' positions but unlawfully narrowing candidates to those sharing President Trump's Republican affiliation.

94.     On May 29, 2025, OPM issued a memorandum on "Merit Hiring Plan" to all departments and agencies. U.S. Office of Personnel Management, *Merit Hiring Plan* (May 29, 2025), https://www.opm.gov/policy-data-oversight/latest-memos/merit-hiring-plan/.

95.     The Merit Hiring Plan requires agencies to consider applicants' answers to four essay questions which test the applicants' partisan allegiance to the Republican Party by compelling responses that emphasize the applicants' support for the current Administration's policies, as opposed to the applicable agency's statutorily-mandated mission statement.

96.     The memorandum does not specify any standards limiting application of these questions to only political appointee positions, and instead applies the questions to any position "graded at GS-05 or above."

97.     As such, the questions serve as a blanket loyalty test, regardless of position.

98.     To ensure that employees, such as Plaintiffs, terminated for their suspected partisan affiliation do not return to Foreign Service, the State Department updated the FSO Test to require applicants to indicate if they previously got RIFed. *See* Dept. of State, *Foreign Service Officer Test Updates* (Sept. 5, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/09/foreign-service-officer-test-fsot-updates.

99.     This question serves as a *de facto* ideological test, because the State Department believes that FSOs previously RIFed supported the Democratic Party.

100.    Defendants also excluded Plaintiffs from participating in career transition programs such as Career Transition Assistance Plan ("CTAP") and Interagency Career Transition Assistance Plan ("ICTAP") to ensure that Plaintiffs are ejected from public service altogether.

101.    These actions directly damaged the Plaintiffs' post termination job prospects and continue to harm them to this day.

102.    Public statements by deciding officials describing USAID cuts in terms of partisan affiliation also continued after Plaintiffs' termination.  For example, in justifying cuts to the Agency, on June 25, 2025, OMB Director Vought stated: "Most Americans would be shocked and appalled to learn that their tax dollars, money they thought were [*sic*] going to medical care, was actually going to far-left activism, population control and sex workers." *OMB Director on Recissions*, C-SPAN (Jun. 25, 2025), https://www.c-span.org/clip/senate-committee/omb-director-on-recissions/5166473.

103.    On January 30, 2025, President Trump appointed Secretary of State Rubio as USAID's acting administrator.  On April 8, 2025, Secretary Rubio stated that terminated Agency contracts promoted the "domestic policies of the far left" and amounted to "cultural imperialism." Dept. of State, *Secretary of State Marco Rubio with Donald Trump, Jr. of Triggered with Don Jr.,* (Apr. 8, 2025), https://www.state.gov/secretary-of-state-marco-rubio-with-donald-trump-jr-of-triggered-with-don-jr/.

104.    Secretary Rubio also conflated lawful work enforcing civil rights laws at the Agency with support for the Democratic Party.  On April 22, 2025, Secretary Rubio reiterated that what he labeled as reorganization instead intended to stifle "anti-woke" work and noted that to

"transfer the remaining functions of USAID" to a "monstrosity of bureaus" that carried out diversity work "would be to undo DOGE's work to build a more efficient and accountable government." *See* Dept. of State, *A New State Department to Meet the Challenges of a New Era* (Apr. 22, 2025), https://statedept.substack.com/p/a-new-state-department-to-meet-the.

105.    Repeating the pattern of partisan-motivated termination that afflicted the Plaintiffs, President Trump clearly indicated that the next round of mass federal layoffs will also target employees by assumed party affiliation, stating, "We'll be laying off a lot of people," adding: "They're going to be Democrats." R. Cowan, *US Government Lurches Toward Shutdown*, *Trump Threatens Fresh Cuts*, REUTERS (Sep. 30, 2025), https://www.reuters.com/world/us/government-shutdown-nears-with-no-deal-washington-2025-09-30/.

106.    Despite Plaintiffs' formal appointment to federal service as employees, legally distinguishing them from contractors, USAID treated Plaintiffs like contractors who may be terminated at will and without prior notice or any post-termination recourse to administrative or judicial review.

107.    The Agency may only terminate Plaintiffs in accordance with constitutional and statutory guarantees flowing from their acceptance of a federal appointment.  These constitutional rights include the First Amendment protection against removal based on political affiliation, and Fifth Amendment Due Process protection in the Agency following its adopted regulations.

108.    USAID treated Plaintiffs with intentional cruelty, denigrating their public service and personal integrity, subjecting them to a prolonged campaign of severe, pervasive and hostile misconduct. OMB Director Vought set forth the strategy of targeted abuse when he stated that he wished employees such as Plaintiffs to be traumatized: "[W]e want them to not want to go to work because they are increasingly viewed as the villains." *See* PROPUBLICA, *The October Story That*

*Outlined Exactly What the Trump Administration Would Do to the Federal Bureaucracy* (Mar. 20, 2025), https://www.propublica.org/article/propublica-russell-vought-prophetic-trump-second-term.

109.    Plaintiffs suffered harm as a result of terminations borne out of Defendants' undeniable animus to their perceived partisan affiliation.

110.    As changes to recruitment policies and the President's recent remarks establish, Plaintiffs are also compelled to engage in activity aligned with the Republican Party if they wish to regain their paychecks and positions, in blatant violation of the First Amendment.

111.    Plaintiffs suffered harm as the foreseeable result of these unlawful acts, including the costs of seeking reemployment and relocation, physical and emotional distress, and damage to personal and professional reputation.  These harms will continue absent the Court's order.

## CLAIMS

112.    Plaintiffs allege violations of the First and Fifth Amendments, the Administrative Leave and Administrative Procedure Acts, *ultra vires* termination and a *mala fide* reduction in force.

## COUNT ONE
### Violation of First Amendment
### (Against all Defendants)

113.    Plaintiffs incorporate all proceeding paragraphs.

114.    The First Amendment protects public employees against retaliation through dismissal based on political affiliation.

115.    Conditioning future public employment on partisan affiliation also violates the First Amendment.

116.    Defendants dismissed Plaintiffs due to their presumed partisan affiliation with the Democratic Party.

117.    Plaintiffs must attempt to establish their ideological loyalty to the Trump Administration before being rehired.

118.    Defendants acted in concert to condition Plaintiffs' future public employment on adopting affiliation with the Republican Party.

119.    Plaintiffs suffered harm due to the government's violation of their free speech and association rights, harm that will continue unless it is enjoined by this Court.

120.    When the United States unlawfully removes appointed employees, the First Amendment provides right to reinstatement, backpay, and compensatory and other relief.

<u>COUNT TWO</u>
**Violation of the Fifth Amendment's Due Process Clause (*Accardi* violation)**
**(Against Defendants USAID and DOS and their Acting Officials)**

121.    Plaintiffs incorporate all proceeding paragraphs.

122.    When agencies adopt rules safeguarding individuals against unlimited agency discretion in termination, they may not subsequently modify those obligations in a manner prejudging the employees. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

123.    When agencies fail to follow regulations they voluntarily adopted, courts must enforce the agency's obligations as a matter of due process, even when the underlying decision involves the exercise of agency discretion over dismissal.

124.    This principle applies when dismissal from federal employment falls substantially short of the requirements of applicable agency regulations.

125.    USAID must follow its regulations, which hold that all personnel programs at the Agency must be administered without discrimination on the basis of partisan affiliation and in accordance with merit principles set forth in the Foreign Service Act. *See* 3 FAM 1212.1 and 3 FAM 4314(6).

126.    The FSA, in turn, adopts the same merit principles for members of the foreign service and civil service, which include giving all employees "fair and equitable treatment in all aspects of personnel management without regard to political affiliation," and protecting employees "against arbitrary action, personal favoritism, or coercion for partisan political purposes." 5 U.S.C. § 2301(b)(2) and (b)(8)(A).

127.    USAID regulations further command the Agency to refrain from adverse decisions influenced by employees' "political affiliation," or carried out for "partisan political purposes." *See* 3 FAM 4314 and 4300; *see also* 5 U.S.C. § 2301(b)(2).

128.    The Agency violated its own regulations by terminating Plaintiffs in a decision animated by partisan purposes that labeled Plaintiffs' perceived ideological affiliation and conduct as criminal.

129.    When it seems probable that an employee is disciplined at least in part because the deciding official mistakenly believed that his or her misconduct violated the law, it is necessary to know what conclusion the decision makers would have reached, and what penalty they would have imposed, if the possibility that the conduct was criminal was removed from consideration.

130.    Here, Defendants inaccurately labeled Plaintiffs' work as criminal, therefore stigmatizing Plaintiffs before terminating them and never analyzed whether Plaintiffs would still be terminated if the incorrect assumption that their work was criminal was removed from consideration.

131.    USAID is also required by its regulations to retain Plaintiffs "for the duration of the specified term of the appointment, as long as their services can be advantageously used by USAID." ADS 450.

132.    The Agency's failure to follow its own regulations to protect against partisan removal violates Plaintiffs' due process rights, stigmatized them, and disqualified them from further federal employment, in violation of the Fifth Amendment.

**COUNT THREE**
**Violation of the Administrative Leave Act**
**(Against all Defendants)**

133.    Plaintiffs incorporate all proceeding paragraphs.

134.    The Administrative Leave Act prevents Defendants from placing an employee on administrative leave for more than a total of ten workdays. *See* 5 U.S.C § 6329a(b)(1).

135.    Defendants forced Plaintiffs on administrative leave from February 4, 2025, and for more than ten calendar days.[2]

136.    Congress amended the Administrative Leave Act to indicate that an agency's decision to keep an employee on administrative leave for more than ten days is an admission that the employee is subject to a disciplinary action or under investigation for misconduct.

137.    The Act only authorizes keeping employees on administrative leave for more than ten days in special cases in which employees are provided with clear evidence that the agency determined that an extended investigation is necessary.

138.    Because Congress views placement on administrative leave for more than ten days as evidence of ongoing investigation for disciplinary action, the Act requires that the employer's notice to the employee placed on leave informs the employee of a notice period of a proposed adverse action against the employee, ending on the date on which an agency may take adverse action. *See id*.

---

[2] USAID notified Plaintiff Boggs on January 7, 2025, that she is an essential employee who is required to work but never expressly notified Plaintiff Boggs that she was no longer subject to the February 4 involuntary administrative leave notice.

139.     Plaintiffs' placement on administrative leave for more than ten days is an admission that the termination is not a *bona fide* RIF but rather, an adverse action to address perceived misconduct and carried out without notice and opportunity to respond, disguised as a RIF.

140.     Plaintiffs suffered harm due to this action, including being denied notice, the opportunity to respond, and the opportunity to perform their duties for more than ten days, which in turn impacted their performance reviews, employment benefits, and ability to find suitable employment after termination.

<u>**COUNT FOUR**</u>
**Violation of the Administrative Procedure Act**
**(Against all Defendants)**

141.     Plaintiffs incorporate all proceeding paragraphs.

142.     USAID is an agency within the meaning of the Administrative Procedure Act.

143.     Under the "APA" a court shall hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, not in accordance with law, contrary to constitutional rights, in excess of statutory authority, or short of statutory right. *See* 5 U.S.C. §§ 551(1), 706(2)(A)-(C).

144.     The Agency's decision to force Plaintiffs on administrative leave and then terminate them is a final agency action subject to APA review, as it marks the consummation of the Agency's decision-making process, and impacts Plaintiffs' rights—from which "legal consequences" flow. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997).

145.     The termination decision is arbitrary and capricious under the APA because it was pretextual, detached from any review of Plaintiffs' individual performance, and without any rational connection between the grounds charged and the interest assertedly served by terminating these employees.

146.    The decision is also contrary to constitutional rights because it violated Plaintiffs' First Amendment free speech and association rights as civil servants to support any political party of their choice—or none at all.

147.    The termination decision is not in accordance with law and was made in excess of statutory authority and short of statutory right because it violated Plaintiffs' rights under the Administrative Leave Act and Civil Service Reform Act ("CSRA") against partisan removal, statutes that apply to USAID and Plaintiffs through the Foreign Service Act. Sec. 105; 22 U.S.C. § 3905.

148.    Plaintiffs' terminations ought to be set aside under the APA as arbitrary, capricious and abusive of the Agency's discretion; not in accordance with the ALA, CSRA and FSA; contrary to the First and Fifth Amendments; and in excess of USAID's statutory authority.

### COUNT FIVE
### *Mala Fide Reduction-in-Force*
### **(Against all Defendants)**

149.    Plaintiffs incorporate all proceeding paragraphs.

150.    Federal agencies may only conduct reductions-in-force, or RIFs, for enumerated *bona fide* reasons.

151.    A RIF may not be used to disguise an adverse action to remove an employee, and when an employee is removed through a sham RIF for reasons personal to the employee the RIF is improper with respect to that employee.

152.    Defendants expressed dissatisfaction with Plaintiffs' perceived political beliefs, expressed animus towards them, and wanted them removed from the Agency for reasons personal to them, even though Plaintiffs maintained skills and qualifications that could still be used at USAID or the State Department to ensure compliance with ongoing, statutorily-mandated work.

153.    The Agency removed Plaintiffs "on the basis of misconduct," disguised as a RIF, but denied them their right to a hearing and review under the Foreign Service Act. Section 610 of the FSA, 22 U.S.C. § 4010.

154.    Plaintiffs suffered harm from the bad-faith RIF because Defendants denied them the opportunity to review and respond to an individualized assessment of their performance and experience and challenge any perception that they are partisan actors engaged in misconduct, which is the real reason why USAID terminated them.

### COUNT SIX
### *Ultra Vires* Termination
### (Against all Defendants)

155.    Plaintiffs incorporate all proceeding paragraphs.

156.    Congress never authorized Defendants OPM, OMB, DOGE or any officials within these offices to terminate USAID employees, nor to impose discipline on Agency employees for misconduct.

157.    Yet OPM, OMB and DOGE directed Plaintiffs' termination from the Agency and imposed discipline on them for their perceived political affiliations.

158.    When an executive official acts *ultra vires*, courts may reestablish the limits on lawful exercise of authority.

159.    When an agency termination decision purports to be from an official with the authority to make such a decision, and it is actually made by someone else without that authority, the decision is an *ultra vires* act that must be reversed.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant relief against Defendants as follows:

A.      Enter a declaratory judgment that Plaintiffs possess the same rights as career Foreign Service Officers also hired through appointment and not contract;

B.      Find Plaintiffs' termination from USAID unlawful as it violated (1) the First Amendment (2) the Fifth Amendment's Due Process Clause, (3) the Administrative Leave Act; (4) the Foreign Service Act and therefore the Administrative Procedure Act; and (5) amounted to bad faith reduction-in-force, and (6) an *ultra vires* action;

C.      Enjoin Defendants from enforcing Plaintiffs' unlawful terminations;

D.      Enjoin Defendants from taking action to enforce guidance, including specifically by Defendant OPM, seeking to evaluate the partisan affiliation of future applicants for Plaintiffs' positions;

E.      Order Defendants USAID and/or the State Department to individually evaluate Plaintiffs' performance during their tenure, and for the Chief Human Capital Officer (or equivalent) of either Defendant to declare under oath and seal the individualized reason and documentation underpinning  that termination, and why Plaintiffs cannot continue their work;

F.      Enjoin Defendants USAID and/or the State Department from rehiring for positions similar or identical to positions for which Plaintiffs are qualified, without notifying the Court, and giving Plaintiffs the chance to be restored to a similar position;

G.      Order Defendants USAID and/or the State Department to update Plaintiffs' personnel files, including their SF-50s, to reflect that their terminations were not performance- or conduct-based and to correct Plaintiffs' retirement status as reflected in their SF-50s;

H.    Provide leave to add additional Plaintiffs by motion, or any method approved by the Court; and

I.    Award Plaintiffs backpay and benefits owed under their employment agreements, compensatory and consequential damages from unlawful termination, reasonable attorneys' fees, costs, and any other relief the Court deems just in amounts to be proven at trial.

## **JURY DEMAND**

Plaintiff demands a trial by jury for all issues so triable.

Dated: January 21, 2026                         Respectfully submitted,

/s/ *Thomas M. Craig*
Thomas M. Craig, DC Bar No. 494503
Kia Rahnama, DC Bar No. 1645325
**Fluet**
1751 Pinnacle Drive, Suite 1000
Tysons, Virginia 22102
T : (703) 590-1234
F : (703) 590-0366
tcraig@fluet.law
krahnama@fluet.law
e-file@fluet.law

*Counsel for Plaintiffs*