**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MADELEINE SMITH, *et al.*,

Plaintiffs,

v.

UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, *et al.*,

Defendants.

Case No. 1:26-cv-00183-TJK

**REPLY BRIEF IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**INTRODUCTION** .......... **1**

**ARGUMENT** .......... **1**

I. Plaintiffs are FSLs who are not Entitled to the Tenure Protections of Foreign Service Officers. .......... 2

II. Plaintiffs' non-Constitutional Claims are Precluded by the Foreign Service Act's Comprehensive Review Scheme. .......... 4

III. Plaintiffs' Claims Should be Dismissed for Failing to Meet the Plausibility Standard under *Twombly*. .......... 8

IV. Plaintiffs are Without Standing to Sue non-USAID Defendants. .......... 13

**CONCLUSION** .......... **14**

# TABLE OF AUTHORITIES

## CASES

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 1, 8, 11, 13

*Heffernan v. City of Paterson, N.J.*,
578 U.S. 266 (2016) ........ 11

*Graham v. Ashcroft*,
358 F.3d 931 (D.C. Cir. 2004) ........ 4, 6, 7

*Jackson v. Kennedy*,
2026 WL 172440 (D.D.C. Jan. 22, 2026) ........ 6, 7

*Nat'l Treasury Emps. Union v. Reagan*,
663 F.2d 239 (D.C. Cir. 1981) ........ 3

*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954) ........ 4

*United States v. Fausto*,
484 U.S. 439 (1988) ........ 4, 5, 6, 7

*U.S. Inf. Agency v. Krc*,
989 F.2d 1211 (D.C. Cir. 1993) ........ 4, 5

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977) ........ 13

*Webster v. Doe*,
486 U.S. 592 (1988) ........ 5

*Widakuswara v. Lake*,
779 F. Supp. 3d 10 (D.D.C. April 22, 2025) ........ 6, 7

## STATUTES

22 U.S.C. § 4010 ........ 1, 3

22 U.S.C. § 4011 ........ *passim*

50 U.S.C. § 3036 ........ 5

**RULES**

Fed. R. Civ. P. 12(b)(1) ........ *passim*

Fed. R. Civ. P. 12(b)(6) ........ *passim*

**OTHER AUTHORITIES**

T. Meisburger, *Political Discrimination Threatens U.S. Foreign Assistance*, Heritage Found. (Aug. 15, 2023), https://www.heritage.org/globalpolitics/report/political-discrimination-threatens-us-foreign-assistance ........ 10

## INTRODUCTION

Plaintiffs—twenty-nine former United States Agency for International Development ("USAID") Foreign Service Limited ("FSL") appointees—were terminated by USAID in 2025 under the broad authority in 22 U.S.C. § 4011 authorizing FSLs' termination "at any time." Plaintiffs try to bypass that provision's broad termination authority by suggesting that they should be treated as tenured foreign service officers, but that unsupported suggestion is unavailing, and § 4011 spells the end to their statutory claims challenging their terminations. As to their constitutional First Amendment claims, Plaintiffs attempt to meld a smattering of statements by the President and others directed primarily at dissatisfaction with USAID as an agency into plausible claims that their own terminations were based on political retaliation. But that attempted alchemy fails to push their claims from barely conceivable to plausible and thus fails to meet the *Twombly* standard. Most of Plaintiffs' claims thus fall outside of the Court's subject-matter jurisdiction, and all would fail on the merits in any event. Accordingly, the Court should dismiss the complaint under Rules 12(b)(1) and 12(b)(6).

## ARGUMENT

Plaintiffs' claims are without merit and should be dismissed under Rule 12(b)(1) and 12(b)(6). Plaintiffs incorrectly assert that they "possess the same rights as career foreign service officers." *See* Opp'n Br., ECF No. 14, at 6. But as FSLs, they are subject to dismissal "at any time" under 22 U.S.C. § 4011 and are only entitled to a pre-termination hearing before the Foreign Service Grievance Board if terminated for cause, which did not take place here. *See* 22 U.S.C. § 4010(a)(2). That is dispositive under Rule 12(b)(1) of Plaintiffs' statutory claims against USAID challenging their dismissal. Plaintiffs' claims against non-USAID defendants should also be dismissed under Rule 12(b)(1) as they lack standing to bring any such claims.

Any remaining claims that survive, such as Plaintiffs' First Amendment claims, are not plausibly pled, in that they seek to aggrandize a smattering of statements generally criticizing USAID into a far-fetched scheme to retaliate against Plaintiffs' exercise of their constitutional rights. The reality is that the administration engaged in a wholesale restructuring of USAID to align with its broad policy goals to which the termination of FSLs was merely an incidental consequence, not retaliatory animus. This Court should decline Plaintiffs' invitation to engage in a protracted fishing expedition to support implausible claims and instead dismiss this case now.

## I. PLAINTIFFS ARE FSLS WHO ARE NOT ENTITLED TO THE TENURE PROTECTIONS OF FOREIGN SERVICE OFFICERS.

As Plaintiffs acknowledge in their complaint, they were at all relevant times employed as FSLs by USAID. Compl. ¶¶ 14-15. *See also* Compl. ¶¶ 16-42, 44-45 (detailing USAID FSL offers of appointment accepted by each plaintiff). Nothing in Plaintiffs' brief provides statutory or caselaw backing to their conclusory assertion that despite being FSLs, Plaintiffs "possess the same rights as career foreign service officers." *See* Opp'n Br., ECF No. 14, at 6.

Plaintiffs argue that FSLs are subject to many of the same requirements and responsibilities as foreign service officers (FSOs), such as liability to fine or imprisonment for fraudulent answers on federal forms or the requirement to adhere to the Ethics in Government Act. *See id.* But just because FSLs and FSOs share similar obligations does not change that they are different classes of employees, subject to different tenure protections. It is up to Congress to create such employee classes, federal agencies to decide which employee class to offer for an open position, and the potential employee to accept or reject a job offer for a position advertised as FSL. Plaintiffs cannot argue a change of that reality years later, absent some statute or caselaw support that they are entitled to tenure protections which do not apply to their position as FSLs.

Plaintiffs' reliance on *Nat'l Treasury Emps. Union v. Reagan*, 663 F.2d 239 (D.C. Cir. 1981) and similar cases misses the point. *See* Opp'n Br., ECF No. 14, at 6-12. In *Reagan*, the D.C. Circuit considered an entirely different question, namely whether individuals hired for federal jobs between November 5, 1980 and January 20, 1981 (after President Reagan's election but before he assumed office) could have their employment (or job offers) rescinded as part of President Reagan's hiring freeze if they had not started working yet. *See Reagan*, 663 F.2d at 241-42. But that question is not at issue here. Plaintiffs themselves acknowledge their appointments as FSLs. *See* Compl. ¶¶ 14-42, 44-45. Unlike in *Reagan*, Plaintiffs were terminated subject to the broad authority in 22 U.S.C. § 4011 to dismiss them "at any time," not because of an argument by the government that they had never entered federal employment. Nor is there any relevance to Plaintiffs' citation to *Reagan*'s discussion of the oath of office taken by federal employees. *See* Opp'n Br., ECF No. 14, at 8-9. Nothing in the oath of office taken by FSLs confers on them the tenure rights of FSOs or other tenured employee classes.

For its part, the relevant statute offers Plaintiffs no support. The broad discretion to terminate FSLs under 22 U.S.C. § 4011 is limited in one specific instance, under 22 U.S.C. § 4010(a)(2)(A)(ii), where an employee "serving under a limited appointment" is entitled to a pre-termination hearing "before the Foreign Service Grievance Board" which must decide that "cause for separation has been established" prior to termination. The same pre-termination hearing for cause is available for Foreign Service employees "serving under a career appointment" under 22 U.S.C. § 4010(a)(2)(A)(i). Thus, Congress has already determined within each statute what tenure rights each class of employee holds.

Even in the alternative, if Plaintiffs are correct that they must be treated as tenured employees, their complaint would be dismissed for lack of jurisdiction, as the FSA requires that

tenured employees asserting unlawful removal must proceed before the Foreign Service Grievance Board ("FSGB"), with judicial review only available following completion of that administrative adjudication process.

At bottom, Plaintiffs are FSLs, they are not entitled to the tenure protections of FSOs, and thus their terminations under 22 U.S.C. § 4011's broad discretion were appropriate.

## II. Plaintiffs' non-Constitutional Claims are Precluded by the Foreign Service Act's Comprehensive Review Scheme.

Plaintiffs' non-constitutional claims, specifically in Counts Three through Six, and in Part Two of Count Two (*Acardi* claim)[1], are all precluded by the Foreign Service Act, the comprehensive administrative-judicial review scheme Congress created to govern most personnel disputes between Foreign Service employees and their agency employers. The FSA broadly precludes district court jurisdiction over statutory claims asserted by personnel within its scheme (except where district court review is provided after exhaustion of administrative remedies under the statute). *U.S. Inf. Agency v. Krc*, 989 F.2d 1211, 1217 (D.C. Cir. 1993). In that regard, the FSA's preclusive effect is like that of the Civil Service Reform Act of 1978, which governs disputes between civil service personnel and their agency employers. *Id*.

As the D.C. Circuit explained in *Krc*, "[l]ike the CSRA, the [FSA] provides 'a comprehensive system for reviewing personnel action[s] taken against federal employees.'" *Id*. (quoting *United States v. Fausto*, 484 U.S. 439, 455 (1988)). That is so even where the FSA withholds an administrative remedy from the employee who seeks judicial review; the plaintiff in

[1] As to Plaintiffs' *Accardi* claim, although it is styled as a Due Process claim and paired with what appears to be a liberty interest Due Process claim as part of Count Two, it is based on Plaintiffs' reading of USAID regulation or internal policy, and thus also precluded by the FSA under binding D.C. Circuit authority in *Graham v. Ashcroft*, 358 F.3d 931, 933-36 (D.C. Cir. 2004) (Roberts, J.). *See* Defendants' Mem., ECF No. 11-1, at 10-12.

*Krc* had no available remedy for his claim alleging reprisal, but the D.C. Circuit relied on *Fausto* to explain that that meant Congress intended to foreclose the claim altogether: "[a]s in the CSRA," the comprehensiveness of the FSA's review scheme and the unavailability of a particular administrative remedy "combine to establish a congressional judgment that . . . judicial review" was not available for the claim at issue. *Id*. (quoting *Fausto*, 484 U.S. at 448).

Plaintiffs' reliance on *Webster* is misplaced. In *Webster v. Doe*, 486 U.S. 592 (1988), a Central Intelligence Agency employee was fired under Section 102(c) of the National Security Act[2], which gives the CIA Director broad discretion to terminate CIA employees whenever the Director "deems the termination . . . necessary or advisable in the interests of the United States." *See Webster*, 486 U.S. at 600; 50 U.S.C. § 3036(e)(1). The broad authority is similar to that of the Secretary in terminating certain USAID employees "at any time" under 22 U.S.C. § 4011.

Plaintiffs argue that, like in *Webster*, the broad authority terminating their employment "cannot be read to deny all judicial and administrative forums." *See* Opp'n Br., ECF No. 14, at 12. But Defendants' position is no different from the Supreme Court's in *Webster*. As in *Webster*, Defendants' position is that the broad authority terminating FSLs "precludes judicial review of these decisions under the APA." *Webster*, 486 U.S. at 601. The Supreme Court in *Webster* left the door open only to "colorable constitutional claims." *See id.* at 602. So too here. Plaintiffs' statutory claims are precluded as outside this Court's subject-matter jurisdiction (under Rule 12(b)(1)) by the Foreign Service Act's comprehensive review scheme.

---

[2] Now codified under 50 U.S.C. § 3036(e)(1), which states in relevant part: "the Director of the Central Intelligence Agency may, in the discretion of the Director, terminate the employment of any officer or employee of the Central Intelligence Agency whenever the Director deems the termination of employment of such officer or employee necessary or advisable in the interest of the United States."

Plaintiffs further assert, incorrectly, that the logic of *Graham* and related cases like *Fausto* in precluding judicial review applies only to certain minor personnel actions, such as short suspensions and letters of censure, but not to major personnel actions, like the termination of Plaintiffs. *See* Opp'n Br., ECF No. 14, at 20-23. But the *Graham* court addressed precisely this issue in stating: "The [*Fausto*] Court reasoned that in not granting review to *some* employees under the CSRA for actions covered by the CSRA, Congress meant to preclude those employees from securing review under other avenues." *Graham*, 358 F.3d at 934 (emphasis in original). The *Fausto* court rejected that plaintiff's claim "because granting it would have given him greater rights than were available under the CSRA to employees who enjoyed rights under that statute." *Id.* And the claim in *Fausto* was not a short suspension (later reduced to a letter of censure) as in *Graham*, but rather a challenge to the plaintiff's "removal." *Id.* So too here.

Thus, the reasoning of *Graham* and *Fausto*, contrary to Plaintiffs' assertions, is that where Congress precludes employees from asserting a claim under the FSA, as is the case with Plaintiff FSLs, Congress also means to prevent those employees from securing review through district court litigation. This is dispositive of Plaintiffs' statutory claims.

Finally, Plaintiffs point to district court cases such as *Widakuswara v. Lake*, 779 F. Supp. 3d 10 (D.D.C. April 22, 2025) and *Jackson v. Kennedy*, 2026 WL 172440 (D.D.C. Jan. 22, 2026) to argue that other district courts have allowed statutory challenges in similar circumstances and rejected a preclusion argument under the CSRA or FSA. *See* Opp'n Br., ECF No. 14, at 24-27. Whatever the merits of either case, both are easily distinguishable.

In *Widakuswara*, the court concluded that the plaintiffs sought a preliminary injunction to prevent execution of Executive Order 14,238 as to halting the programming and ending grants of the United States Agency for Global Media on numerous grounds, including under claims that

such actions violate "constitutional separation of powers principles, the Take Care Clause," the "International Broadcasting Act, and congressional appropriations acts." *Widakuswara*, 779 F. Supp. 3d at 18-19. Although plaintiffs in that case also claimed violations of the APA, they relied on numerous constitutional and statutory claims to challenge the implementation of the Executive Order in question and to forestall, on an expedited basis, the shuttering of their agency. Plaintiffs in this case do not challenge actions divorced from their individual terminations—they do not, for example, challenge the administration's actions in the restructuring of USAID or seek expedited relief prior to an agency restructuring. This case *is* "simply a collection of employment disputes" and not a case where "individual government employee plaintiffs" are "challenging the dismantling" of an agency. *Id.* at 30-31. Such employment disputes are precluded from this Court's jurisdiction due to the preclusive effect of the FSA.

*Jackson* is also easily distinguishable as the issue there was whether the CSRA precluded federal employees from directly bringing Privacy Act claims to district court. *Jackson*, 2026 WL 172440 at *10. The district court there held that numerous factors, including the Privacy Act's "own express grant of jurisdiction to the federal courts" favored a "statute-specific analysis[,]" reasoned against finding that Privacy Act claims were precluded by CSRA. *Id.* Plaintiffs here, of course, advance no such Privacy Act claims. Thus, whatever the merits of *Jackson*, that case is plainly inapposite.

At bottom, Plaintiffs' claims are employment disputes by a class of employees – FSLs – who have very limited tenure rights, restricted to a pre-termination hearing prior to termination for cause, which is plainly inapplicable here. Plaintiffs' statutory challenges are precluded by the FSA, and under the logic of *Graham* and *Fausto*, their inability to bring an administrative challenge under the FSA also eliminates their ability to bring the same challenge before this Court.

## III. PLAINTIFFS' CLAIMS SHOULD BE DISMISSED FOR FAILING TO MEET THE PLAUSIBILITY STANDARD UNDER *TWOMBLY*.

As set out in greater detail in Defendants' Memorandum of Law in Support of their Motion to Dismiss, ECF No. 11-1, at 15-31, all of Plaintiffs' claims should be independently dismissed under Rule 12(b)(6) for failure to state a claim. In the interests of efficiency, Defendants' respond to Plaintiffs' constitutional claims in Counts One and Two.

1. As to Count One, Plaintiffs acknowledge that USAID FSLs were removed "*en masse*" at the same time wide-ranging RIFs were taking place across the agency. FSL appointments, including those of Plaintiffs, were terminated without regard to anyone's political affiliation (actual or perceived). Thus, Plaintiffs cannot show that their First Amendment rights were violated. Seeking to bolster Count One, Plaintiffs point to various 2025 statements by the President and Administration personnel criticizing USAID as an agency, as well as its leaders and its work. Tellingly, however, Plaintiffs do not (and cannot) plead to any specific nexus linking dissatisfaction with USAID to an unconstitutional motive to dismiss any individual Plaintiff for perceived partisan affiliation.

In their Opposition, Plaintiffs retort that their complaint references at least five statements that are not merely general public policy statements but rather "explicitly target USAID workers." *See* Opp'n Br., ECF No. 14, at 13-14. Plaintiffs first point to a statement attributed to the President that USAID has "been run by a bunch of radical lunatics." *Id.* at 13, quoting Compl., ECF No. 1, ¶ 66. Plaintiffs also point a statement attributed to White House Deputy Chief of Staff Stephen Miller, that "ninety-eight percent [of USAID] either donated to Kamala Harris or another left-wing candidate." *Id.*, quoting Compl., ECF No. 1, ¶ 72. Plaintiffs also point to a statement attributed to Peter Marocco, USAID Deputy Administrator, that "he considered criminal referral to the Department of Justice for employees involved with the Agency programs being cut." *Id.*, quoting

Compl. ¶ 78. Plaintiffs also point to statements by Timothy Meisburger, a USAID bureau head in 2025, that "well over 90 percent (and sometimes one-hundred percent) of [USAID] employee contributions went only to Democratic candidates and causes," and advocated eliminating "USAID's political bias." *Id.*, quoting Compl. ¶ 83. Finally, Plaintiffs point to a statement attributed to President Trump on or about September 30, 2025 that: "We'll be laying off a lot of people . . . They're going to be Democrats." *Id.* at 14, quoting Compl. ¶ 105.

None of those statements has any bearing on the plausibility of Plaintiffs' claims that they themselves were terminated on the basis of perceived political affiliation. The first statement, referring to USAID *leadership*, is categorically irrelevant to Plaintiffs, who were FSLs appointed to limited terms, and could hardly be described as USAID's leadership. Nor is it clear that the President's assessment of senior agency officials concerns those agency officials' political beliefs as opposed to their public policy priorities.

Likewise, the second statement, Mr. Miller's assertion that 98% of USAID donated to Ms. Harris or left-wing candidates, cannot support Plaintiffs' constitutional claims without also showing some plausible nexus between Mr. Miller's statement and a decision terminating Plaintiffs. Plaintiffs do not allege, for instance, that Mr. Miller played a decisive role, or indeed any role, in their terminations, let alone that Mr. Miller did so out of political animus. In fact, Mr. Miller has not been sued as a defendant in this case, and was never part of USAID or State Department leadership, and thus cannot be characterized as playing any role in the decision to terminate Plaintiffs.

As to the third statement, attributed to Mr. Marocco, that he allegedly considered criminal referrals for certain unnamed USAID employees, that statement is irrelevant to this litigation, as the statement does not reflect any political bias or political retaliation.

The fourth statement, attributed to Mr. Meisburger, is part of a Heritage Foundation report he authored in 2023 as a private citizen, prior to his government service in USAID in 2025. His report purports to track political contributions from agencies, including USAID, and concluded that 90% or more of USAID contributions went to Democratic candidates and causes. That report recommended that Congress take steps to have agencies like USAID "explain the lack of political diversity in their organizations" and "rectify their gross political bias". *See* T. Meisburger, *Political Discrimination Threatens U.S. Foreign Assistance*, Heritage Found. (Aug. 15, 2023), https://www.heritage.org/globalpolitics/report/political-discrimination-threatens-us-foreign-assistance. But again, Plaintiffs are unable to show a plausible nexus between a recommendation made in a report in 2023—approximately two years prior to their terminations—to any alleged constitutional violation in their terminations. For instance, Plaintiffs do not articulate whether Mr. Meisburger was in a position to carry out personnel changes at USAID two years after the statements in his 2023 report, aside from their statement that Mr. Meisburger "served as a bureau head in USAID in 2025." Compl. ¶ 80.

The fifth statement, attributed to the President, was made on or about September 30, 2025, in the context of an imminent lapse in appropriations. Crucially, the statement was made well after Plaintiffs were terminated. *See* Compl. ¶ 43 (indicating most Plaintiffs were terminated on July 1, 2025); ¶ 46 (indicating remaining Plaintiffs were terminated on September 2, 2025). The President's statement, presumably intended to press members of Congress to prevent the lapse in appropriations, is hardly relevant to Plaintiffs' terminations, which took place weeks or even months earlier.

It is true that at the motion to dismiss stage, this Court must construe factual allegations in the complaint in favor of the plaintiff. But Plaintiffs must first in turn plead allegations that are

not merely conceivable but that are plausible under the *Twombly* standard. Under that standard, factual allegations that are "merely consistent with" liability, and as to which an "obvious alternative explanation" exists, do not cross "the line between possibility and plausibility." *Twombly*, 550 U.S. at 557, 567. Plaintiffs' smattering of statements highlighted here is inadequate to meet that modest bar, given the obvious alternative explanation that Plaintiffs were instead terminated in furtherance of the Administration's goal to curtail USAID's programmatic actions, refocus its mission, and reduce its staffing to better align USAID's priorities with Administration policies.

2. Plaintiffs cite *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266 (2016) to argue that an "actionable violation of the First Amendment [occurs] when [Plaintiffs] show that a public employer's firing of an employee was based on the employer's belief that the employee had engaged in activity protected by the First Amendment (regardless of whether or not the employer's belief was mistaken and whether or not the underlying activity actually occurred)." *See* Opp'n Br., ECF No. 14, at 15. Defendants find no fault with the articulation of that standard. But Plaintiffs have not made that showing in their complaint here.

In *Heffernan*, a police officer was demoted from detective to patrol officer on the mistaken belief that the officer was campaigning for a rival candidate to the mayor who appointed that police officer's supervisor and the chief of police. *Heffernan*, 578 U.S. 268-69. In reality, the police officer in question was merely collecting a campaign sign for a relative. *Id.* at 269. Nevertheless, the Supreme Court grappled with the issue of whether the police officer's First Amendment rights were violated when the police officer had not in fact exercised those rights. *Id.* In *Heffernan*, and unlike in this case, there was a clear nexus between a constitutionally protected right, namely a First Amendment freedom of speech to campaign on behalf a favored candidate for political office,

and a violation of that right, namely in the demotion of the officer in question. No such clear nexus is presented here. Plaintiffs rely on a smattering of statements, discredited *supra*, which Plaintiffs allege provide a nexus for their terminations as unconstitutional political retaliation. Even at the motion to dismiss phase, Plaintiffs must plausibly plead facts sufficient to sustain their claims, and Plaintiffs have not done so here.

3. As to the Due Process claims asserted within Count Two, Plaintiffs fail to state a claim. First, Plaintiffs' continued employment as USAID FSLs was subject to the Secretary's discretion, without any statutory entitlement to continued employment, so Plaintiffs cannot state a claim under the Due Process Clause. Here too, they seek to avoid that conclusion by suggesting that they were doing work similar to that done by tenured Foreign Service or career Civil Service employees—who have greater statutory employment protections—and thus should be afforded the same protections. But that is not how due process works. (And even if Plaintiffs are correct that they must be treated as tenured employees, their complaint would be dismissed for lack of jurisdiction, as the FSA requires that tenured employees asserting unlawful removal must proceed before the FSGB, with judicial review only available following completion of that administrative adjudication process.) Second, insofar as Plaintiffs allege a liberty interest claim stemming from Defendants' broad criticism of USAID's work prior to their terminations, Plaintiffs do not state a claim under that theory either. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss, ECF No. 11-1, at 24-25.

At bottom, Plaintiffs have failed to state a claim with respect to the constitutional claims in Count One and Two. Plaintiffs' other claims also independently fail under Rule 12(b)(6), for the reasons previously discussed in Defendants' Memorandum of Law in Support of their Motion to Dismiss, ECF No. 11-1, at 15-31.

## IV. Plaintiffs are Without Standing to Sue non-USAID Defendants.

Plaintiffs were FSLs appointed, employed, and ultimately terminated by USAID. Yet they sue not just USAID, but the State Department, OPM, OMB, and USDS, asserting the same claims against all five agencies or entities. They have not adequately pleaded any basis for standing to sue any defendant beyond USAID, and they could not in any event. Each of their claims against the State Department, OPM, OMB, and USDS should thus be dismissed for lack of standing.

Most of the claims asserted in Plaintiffs' Counts One through Six challenge their terminations from USAID. In support of those claims, they allege that "[a]t all material times, USAID employed [them] at its principal place of business in Washington, D.C.[,]" Compl. ¶ 48; that "USAID terminated [most of them] on July 1, 2025[,]" *id*. ¶ 43; and that "USAID terminated [the remainder of them] on September 2, 2025[,]" *id*. ¶ 46. *See also id*. ¶¶ 56, 58, sub-paragraphs (a) through (n) (detailing allegations regarding the terms and conditions of Plaintiffs' employment by USAID.) Crucially, Plaintiffs do not allege that non-USAID Defendants terminated them.

Plaintiffs argue two major points, though neither is meritorious. *See* Opp'n Br., ECF No. 14, at 33-35. First, Plaintiffs rely on *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–68 (1977), to argue that a "bounty of statements by non-USAID" defendants allows the court to determine whether a "discriminatory purpose can be inferred" by "contemporary" statements. *Id.* But Plaintiffs do not point out which of that so-called "bounty of statements" (1) involves non-USAID defendants and (2) plausibly demonstrates a violation of Plaintiffs' constitutional rights, as opposed to language generally hostile to USAID as an agency. In fact, none do. Moreover, nowhere in their complaint have Plaintiffs adequately pled a causal nexus between any non-USAID defendant's statements or actions and the termination of one or more Plaintiffs. *Twombly* requires more to plausibly plead a claim.

Second, as to Defendant OPM, Plaintiffs point out that OPM has "effectively taken over USAID's representation before the MSPB." *See* Opp'n Br., ECF No. 14, at 35. So what? Defendants' assertion that OPM represents USAID as counsel in employee appeals to the MSPB is irrelevant to whether OPM officials violated Plaintiffs' constitutional rights in their termination from USAID. Again, without more, the mere existence of such representation, particularly if entered into after the significant reductions in force at USAID (and after the decision to terminate Plaintiffs), provides no plausible claim that OPM has a case to answer.

Consequently, this Court should dismiss all non-USAID plaintiffs.

## CONCLUSION

For the reasons above, the vast majority of Plaintiffs' Counts and claims, specifically Plaintiffs' statutory claims in part two of Count Two and in Counts Three through Six, fall outside of district court jurisdiction, and should be dismissed under Rule 12(b)(1). At the same time, all of Plaintiffs' Counts against the non-USAID Defendants—the State Department, OPM, OMB, and USDS—fail for lack of standing and should likewise be dismissed under Rule 12(b)(1). Finally, Plaintiffs fail to state a claim as to their constitutional claims in Counts One and Two, which should be dismissed under Rule 12(b)(6).

Accordingly, Plaintiffs' claims should be dismissed in their entirety.

Dated: August 20, 2026

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

CHRISTOPHER R. HALL
*Assistant Branch Director*

/s/ *Esam K. Al-Shareffi*
ESAM K. AL-SHAREFFI
(D.C. Bar No. 90010174)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 598-7367
E-mail: esam.k.al-shareffi@usdoj.gov

*Counsel for Defendants*